Whaley, Judge,
delivered the opinion of the court:
The plaintiff, a Pennsylvania corporation, under date of September 14, 1922, entered into a written agreement with the defendant, acting through B.. W. Crawford, major, Corps of Engineers, United States Army, therein designated the contracting officer, representing the United States, whereby it undertook to furnish, in conformity with the advertisement and specifications attached to and forming part of the contract, “ all the necessary labor, material, machinery, equipment (except as specified), erect and install the engines and equipment specified, construct, test, and deliver afloat at contractor’s yard at Chester, Pa., together with the test data, records of weights, patterns, and plans, four Diesel electric seagoing hopper dredges ” for a total consideration of $2,528,240. The plaintiff received notice of the approval of the contract by the Chief of Engineers *172 on September 21,1922. The first dredge was to be delivered within 16 months from the approval of the contract and one dredge each succeeding month until all were delivered. The dredges were given numbers by the plaintiff and names by the defendant as follows:
Number 58_A. MaeKenzie.
Number 59_W. L. Marshall.
Number 60_Dan O. Kingman.
Number 61_Wm. T. Kossell.
Dredges of this type had never been built by the Government before and the officers in charge of the work for the defendant had no experience in marine work. Certain engines, material, and equipment were to be provided by the defendant.
The specifications were in minute detail and the contractor was to provide detailed working plans from the specifications and these plans had to be submitted to the contracting officer for inspection and approval. In each case the working plans, prepared by the contractor from the specifications, according to which all the work was accomplished, were signed and approved by the contracting officer.
This suit is brought to recover for (a) alleged extra work performed and not paid for by the defendant; (b) delays caused by the performance of this extra work for which no allowance in remission of liquidated damages was granted; (o) extension of time in remission of delays caused by extra work ordered and paid for by the defendant; (d) unavoidable delay caused through no fault of plaintiff which was not allowed by defendant in mitigation of liquidated damages ; and (e) extra work and changes ordered by defendant and performed by plaintiff after the contract completion dates of delivery of the respective dredges and for which period liquidated damages were assessed. The plaintiff contends that the question of what was extra work and the extension of time by reason thereof; the extension of time for completion, due to delays caused by the defendant, and the remission of liquidated damages by reason thereof were not determined and decided by the officer mutually agreed upon and named in the contract.
*173 The plaintiff contends tbe specifications require the Assistant Chief of Engineers to be the contracting officer and that another officer lower in rank was named in the contract. Before plaintiff signed the contract its board of directors passed a resolution authorizing the proper officers to enter into a contract with R. W. Crawford, as contracting officer, and when plaintiff signed the contract it knew Crawford was named therein as contracting officer. It had a right to have the assistant to the Chief of Engineers as the contracting officer, but this right it waived by resolution of its board of directors and the signing of the contract which specifically named Crawford as the contracting officer.
Throughout the entire contract plaintiff recognized Crawford as the contracting officer. The plaintiff is bound by its own actions.
(1) Re fairing Engines
Under the specifications the Government was to furnish the main engines together “with the necessary parts for ■converting same from marine type to type suitable for ■direct connection to main generator * * *.” These engines were purchased from the Shipping Board by the ■contracting officer.
It was discovered when the engines for the MacKenzie (No. 58) and Marshall (No. 59) were assembled by the plaintiff that the bolt holes in the flanges of the engine shafts and those of the generator shafts were not aligned. It was necessary to plug and weld the old holes and to drill new holes in the correct alignment. This discovery was not riiade until the engines were in the hold of one of the vessels and •entailed much laborious work which interfered with the scheduled progress of the construction of other parts of the work. The defendant paid for this work as an extra. The plaintiff made a claim under article 5 of the contract for an extension of time because of delay caused by the defendant. The contracting officer admitted the delay was caused by the Government but declined to recommend to the Chief of Engineers extension of time. The Chief of Engineers extended the time to the completion of the contract, *174 in which to make a claim for deduction of liquidated damages and remission for acts of delay occasioned by the Government. There is no evidence in the record to show that the Chief of Engineers at any time thereafter definitely passed on this question of extension of time for completion. The uncontradicted evidence shows that at least 45 days’ delay was occasioned by the repairs to these engines. The completion of these two ships was delayed by the defendant but the actual extent of the delay is not determinable from the evidence. The Chief of Engineers should have decided the number of delay days caused by the Government.
The contract provided remission of damages should be decided by the Chief of Engineers upon recommendation of the contracting officer when the Government delayed the contractor. The plaintiff was entitled under the terms of the contract to a fair, impartial decision by the Chief of Engineers, and upon his failure to so decide cannot be held for liquidated damages for the period involved. Shippey et al. v. United States, 49 C.Cls. 151, 171.
(2) Hopper Door Operating Gear
Paragraph 205 of the specifications provided “ the operating mechanism shall be of the motor-driven type, operating through gears, threaded shaft, crosshead, sliding channel bars, and connecting chains and rods, essentially as shown.” The defendant decided to use a different arrangement and ordered as an extra “ electric hydraulic gear, for operating-the-water-tight doors * *
The plaintiff was paid for this change. However, when the ship listed the pump and motor of one gear failed to operate satisfactorily the other gear, and, due to friction of the entire installation, the mechanism would not overhaul with one gate.
The plaintiff installed the electric hydraulic gear according to the plans and specifications fully approved and adopted by and under the direction of the defendant. There was nothing wrong with the installation, but the arrangement was unsatisfactory. The plaintiff did not undertake-to guarantee the working of the gear to be satisfactory to the *175 defendant. There is no evidence that the gear failed to work due to faulty installation, but it did not combine both a pull and push ram. This work was clearly outside the contract and payment should have been made for it as an extra. The device worked as a pulling hydraulic ram, but,, after it was found that it did not also work as a pushing ram, the defendant desired it to combine both functions and required the plaintiff to make the change. The plaintiff contended it was an extra and demanded payment for the work which the defendant declined to recognize as an extra and demanded the change. The work was performed by the plaintiff after due protest, as provided in the contract, at a cost for the four ships of $1,546.77. The plaintiff is entitled to recover this amount. The change required extra work on each vessel for which no allowance was made to the plaintiff for delays caused by the defendant.
(3) Lubricating Oil System
Paragraph 245 of the specifications provide:
“A steel sump tank with a capacity of 1,000 gallons shall be installed under engine-room floor adjacent to compressor end of main engines. The lubricating oil drain pipes from engines shall discharge into this tank. The lubricating oil pumps shall draw from the sump tanks and discharge to engines and lubricating oil filters. Thermometers shall be fitted for taking temperature of oil discharged from engines. The line leading to oil filters shall be fitted with a spring-loaded valve of approved size and make. The discharge line to filters shall have by-pass, with suitable valves fitted, leading to sump tank. The discharge line to engine shall have valve and pressure gauge fitted. A branch line from discharge pipe shall lead to main deck outside of deck house, and be fitted with necessary valves, etc., in order to discharge dirty oil from sump tank to shore. The oil filter discharge shall lead to sump tank. All valves in lubricating oil suction and discharge system shall be gate valves. The lubricating oil system for auxiliary engines shall be separate from and similar to that for main engine, except lubricating oil pumps are attached direct to engines and sump tank is built in engine bedplate. Lubricating oil pumps shall be piped to filter located above engine.”
*176 A detail plan in accordance with the specification was prepared by the plaintiff, submitted to the defendant, and adopted and approved by the contracting officer.
The system was installed in accordance with the plans, but when the vessel listed the drain pipes and manifolds were not of sufficient capacity to drain off the oil in the engine base. The contracting officer ordered additional manifolds installed. The plaintiff claimed extra compensation for the additional manifolds which was refused by the defendant and the work was performed under protest by the contractor. The plaintiff carried out the plans and specifications. It was not called upon to do more. The requirement of additional manifolds was outside the plans and specifications as approved. It was an extra for which the plaintiff was entitled to be paid. The cost of the work on the four dredges was $3,579.04. The performance of this extra work for which the defendant was liable required additional working hours but no extension of time was allowed by the defendant.
(4) Gravity Lvibicating Oil Tank
Paragraph 267 (4) of the specifications provides:
“A gravity lubricating oil tank of at least 250 gallons capacity shall be provided and installed so as to supply oil at motor bearings at approximately 2 pounds pressure.”
The plaintiff installed, according to the plans and specifications, lubricating oil tanks that supplied the oil to the engines by gravity. It was necessary to turn on and shut off the supply of oil when the engines started and stopped. The system as installed worked satisfactorily as a gravity lubricating system, but the defendant decided, after it was installed, to change the location of the lubricating oil tanks and convert the gravity system to a pump system by placing the tanks below the engines and pumping the oil to the engines, and this pump was so arranged that it would start and stop with the motor and thus avoid any manual labor. This was a change of the system of lubrication not mentioned in the specifications and outside of the plans as approved. *177 The plaintiff made the change under orders, protesting the work was outside the contract. It was clearly not within the conditions of the contract and specifications. The work cost $1,665.83 for the four dredges, including overhead, for which the plaintiff is entitled to recover. The work required extra time to perform but no allowance was given the plaintiff for this extra work required by the Government. It is impossible from the evidence to definitely fix the exact number of days’ delay caused by the defendant in this instance.
(5) Installation of Electric Oil Heaters
In accordance with the requirement of the specifications of the contract plaintiff prepared detailed working plans for the installation of the electric oil heaters, or, as it is termed, the “ heating pot.” The heating pot served to give greater fluidity to the fuel oil as it entered the Diesel engine. Although the detailed plans and the installation itself were made and done under the immediate direction of defendant’s inspector, the operation of the heater was not satisfactory. The heating element burnt out. The inspector, presumably on the supposition that the trouble encountered was due to faulty location, required plaintiff to relocate the system, which plaintiff did, and for this work plaintiff claims no extra compensation. The operation was still unsatisfactory, and the contracting officer required plaintiff to change back to the original location and for this second change plaintiff seeks extra compensation. Plaintiff complied with this second requirement. The trouble, however, was in the heating pot itself, due to an unfortunate location therein of'the heating elements. Plaintiff’s engineer redesigned the heating pot, and thus eliminated the difficulty.
It goes without saying that what the contract required was an arrangement that would heat the fuel oil at all times when conditions required, not one that would burn itself out instead. There is nothing of record to show that the interior design of the heating pot was revealed to or approved by the contracting officer. If the heating pot had *178 functioned as it should, it is reasonable to assume that its shifting to and fro would not have been ordered. The facts show no order in writing changing the location from where it was originally installed. The written order relates only to placing it in its original position in accordance with the approved working plans. This was plainly within the contracting officer’s rights. Article 9 of the contract provides, “ Until final inspection and acceptance of, and payment for, all of the material and work herein provided for, no prior inspection, payment, or act is to be construed as a waiver of the right of the contracting officer to reject any defective work or material or to require the fulfillment of any of the terms of the contract.” Under this article the act of the inspector, requiring the first change, did not waive the contracting officer’s right to require reinstallation in accordance with the working plans which he had approved and by his approval adopted. On this item there can be no recovery.
(6) Refairing Cylinders of Auxiliary Engines
Under the contract the defendant furnished the auxiliary engines. These engines were constructed by McIntosh and Seymour under the direction and inspection of the defendant. A thorough test was made at the plant of the manufacturers in the presence of the inspectors of the defendant. The engines were delivered by the defendant to the plaintiff and stored by the latter in a suitable, safe, and dry place approved by the contracting officer. When these engines were tested at the plant of the constructors it was necessary to have water in the cylinders, but it was customary and in accordance with good practice of the trade to blow out the water from the cylinders before delivery and shipment. The agents of the defendant failed to remove all water from the cylinders and no notice was given the plaintiff that the cylinders contained water. During the winter the water in the cylinders froze, cracking the air-compressor jackets, exhaust-gas tees and cylinder water jackets. This condition was discovered after the engines had been installed in the vessels and while trying out the circulating water systems. The defendant required the plaintiff to make the necessary *179 repairs and refused reimbursement under paragraph 21 of the specifications, which provides:
“ The contractor shall furnish a safe, dry, and suitable place, approved by the contracting officer, for storage of machinery, equipment, and outfit furnished by the contracting-officer for the vessel, or vessels, and shall be responsible for any damages to them. * * * ”
There is no dispute that the place in which the engines were stored was safe, dry, and suitable and had the approval of the contracting officer. But it is contended by the defendant, and it was the ground on which the contracting officer denied the plaintiff’s claim for payment for extra work and extension of time, that the clause “ * * * shall be responsible for any damage to them” means the plaintiff is an insurer of the property so stored.
The water was in the engines before delivery to the plaintiff. Had it been removed by the defendant’s agents no damage would have resulted. The place of storage did not occasion the damage. The plaintiff was not responsible for the condition of the engines when delivered to it and by the exercise of every reasonable inspection of the engines could not have known water had been left in the cylinders. There is nothing in the specifications requiring the plaintiff to dismantle the engines to ascertain if the defendant had complied with the ordinary and customary precaution of engine builders. If the water had gotten into the cylinders while in the bailment of the plaintiff there would be no doubt of its liability, but the water was in the cylinders when the engines were delivered by the Government. See Gulf Transit Co. v. United States, 43 C.Cls. 183, 200. The plaintiff had every reason to believe there was no water in the cylinders. The engines were the property of the defendant and no injury to them was occasioned by any act of the plaintiff while in its possession which would hold it responsible under the rules of liability of a bailee. The plaintiff, as bailee, was only required to use ordinary and reasonable measures to safeguard the property. In this case it would have required extraordinary precaution to have discovered the water in the cylinders.
*180 If the manufacturers of the engines had not left water in the cylinders and jackets the water would not have frozen and the engines would not have been damaged. The proximate cause of the damages was the water in the cylinders, and the responsibility for the water was the manufacturers’ and they were the agents of the defendant, so the defendant is liable for the damage. No notice was given the plaintiff of even the possibility of water being left in the cylinders, and therefore extra precaution in storage was unnecessary. Under plaintiff’s contract the ordinary rules of bailment apply and these rules only require ordinary custodianship and not the additional liability of an insurer. Sturm v. Boker, 150 U.S. 312.
The plaintiff was required to repair the engines by the contracting officer. After due protest the work was performed at a cost of $10,734.12. The plaintiff is entitled to recover this amount. The repairs to the engines caused a delay in the work for which the Government was responsible and the plaintiff was entitled to a,n extension of time for completion of the contract. No extension of time was given.
(7) Listing of Ship
Paragraph 259 of the specifications provides:
“ Due to the location off center line of main engines and dredging pump in forward engine room, the contractor shall make accurate calculations to determine if the ship will have a list to port or starboard. If the calculations show that a list will exist, same shall be corrected by moving miscellaneous tanks, etc., to side of ship opposite to that where list is found.”
When the ships were launched there was a list and the contractor was required to move certain king-posts and winches, fuel service tanks, and stream chain box in order to correct the list. The specifications placed the responsibility upon the contractor to make “ accurate calculations ” to avoid a list and the manner in which the corrections should be made in case of a list. The calculations were made by the contractor’s naval architect. It was necessary to move the miscellaneous tanks, etc., to correct the list. *181 The contractor undertook to make the corrections in case of failure of calculations made by it. The naval architect of the plaintiff was not called as a witness. These changes, necessitated to correct the list, were those called for in the specifications and for which the contractor was responsible.
(8) Governors
The specifications required the defendant to furnish the governors to change engines from the marine type to direct-connected generator type. The governors supplied by the defendant were defective. The plaintiff repaired and adjusted them and was paid for the work as an extra but was not granted an extension of time for the delay occasioned by the work necessary to put the governors in proper condition. From the evidence it is impossible to determine the exact delay but there is no doubt from the evidence the completion date on each dredge was retarded.
(9) Launching of the Rossell
When the last of the four dredges was launched, as it left the ways the rudder hit a hidden and sunken object and broke loose, fracturing the stern post. The contractor had taken every reasonable precaution in preparation for the launching. The evidence clearly establishes the fact that the accident was unforeseeable. A careful survey was made by the insurance company with whom the plaintiff was insured and resulted in a decision that the accident was beyond the control of the plaintiff, and reimbursement for damages suffered was made to plaintiff. For unforeseeable delays the plaintiff under the contract was entitled to an extension of time. Upon application for an extension of time the contracting officer declined to grant any extension. Under the terms of the contract all extensions by reason of delays caused by the defendant or unforeseeable delays were to be finally decided by the Chief of Engineers. The evidence fails to show the Chief of Engineers made a decision. The plaintiff was delayed in the completion of this dredge by reason of this accident to the rudder but the evidence of the extent of the delay is indeterminable.
*182 (10) Liquidated Damages and Remission of Damages
During the execution of the contract the contracting officer notified plaintiff that all questions as to what was extra work, remission of damages for delays caused by the defendant, and assessment of liquidated damages must be submitted to the Comptroller General for final decision. The contractor protested against presenting its claims to the Comptroller. The contracting officer admits in his testimony he was fearful of, but not dominated by, the Comptroller General. The plaintiff submitted its claims to the Comptroller as required by the contracting officer. In making a settlement under the contract, the Comptroller General, from amount certified by him as otherwise due the plaintiff, deducted for cost of inspection and liquidated damages for delays, $118,-488.65. From this amount at the urgent request of the contracting officer the Comptroller General remitted $8,800.88, making a total deduction so withheld of $110,187.82.
Article 5 of the contract after providing liquidated damages and cost of inspection contains an important and vital proviso which reads:
“ARTiolb 5. Time shall be considered an essential feature of this contract; and in case of the failure on the part of the contractor to complete this contract within the time specified and agreed upon, the United States will be damaged thereby, and the amount of said damages, exclusive of expenses for inspection and superintendence, including necessary traveling expenses, being difficult if not impossible of definite ascertainment and proof, it is hereby agreed that the amount of such damages shall be estimated, agreed upon, liquidated and fixed in advance; and they are hereby agreed upon, liquidated, and fixed at the sum of $200 per dredge per day, for each and every day the contractor shall delay in the completion of this contract; and the contractor hereby agrees to pay to the United States as liquidated damages, and not by way of penalty, the said sum of $200 per dredge per day for each and every day the contractor shall delay in the completion of this contract. Should this contract not be completed within the time specified and agreed upon, the contractor shall pay, in addition to the liquidated damages, hereinbefore specified, all expenses for inspection and super *183 intendence after the date fixed for completion, including all necessary traveling expenses connected therewith, which shall be determined by the contracting officer and deducted from any payment due or to become due the contractor: Provided, however, That no deduction of liquidated damages and no charges for inspection and superintendence shall be made for such period after the date fixed for completion of this contract as, in the judgment of the contracting officer, approved by the Chief of Engineers$ shall equal the time which shall'have been lost through any cause for which the United States is responsible either in the beginning or prosecution of the work or in the performance of extra work ordered by the contracting officer or on account of unusual freshets, ice, rainfall, or other abnormal force or violence of the elements, or by strikes, epidemics, local or State quarantine restrictions, or other unforeseeable cause of delay arising through no fault of the contractor, and which actually prevented such contractor from delivering- the material or commencing or completing the work within the period required by the contract. The findings of the contracting officer, approved by the Chief of Engineers, shall be accepted by the parties hereto as final. But any allowance of time- and remission of charges shall in no other manner affect the rights or obligations of the parties under this contract, nor be construed to prevent action under article 4 hereof in case the contractor shall fail, in the judgment of the contracting officer, to make reasonable and satisfactory progress after such allowance of time has been granted.” [Italics ours.}
The plaintiff was assessed damages of $200 a day for 497 days’ delay plus expenses for inspection and superintendence, in the sum of $118,488.65. The number of days assessed against each vessel is as follows:
[1] No. 58. A. MacKenzie
Approval of contract Sept. 21, 1922, 16 months, January 21, 1924. The dredge was not completed and accepted until May 28, 1924, or 128 days after the date called for in the contract.
[2] No. 59. W. L. Marshall
Approval of contract Sept. 21, 1922, 17 months, February 21, 1924. Completed and accepted June 14, 1924, or 114 days after the date called for in the contract.
*184 [3] No. 60. Don G. Kingincm
Approval of contract Sept. 21, 1922,18 months, March 21, 1924. Completed and accepted August 4, 1924, or 136 days after the date called for in the contract.
[4] No. 61. Wm. T. Bossell
Approval of contract Sept. 21, 1922, 19 months, April 21, 1924. Completed and accepted August 18, 1924, or 119 days after date called for in contract.
The total number of days of delay, together with the expenses of inspection and superintendence, were deducted by the Comptroller. It was afterwards ascertained a certain number of days were included which represented days after the dredges had been accepted and were in the possession and control of the defendant, but certain plans, dies, etc., had not been delivered on board each ship, and until they were delivered each day was included in the liquidated damage clause. Upon the request of the contracting officer the Comptroller remitted for this period the sum of $8,300.83 and deducted the sum of $110,181.82.
The provision for extension of time in mitigation of liquidated damages through any cause for which the Government is responsible places the decision “ in the judgment of the contracting officer, approved by the Chief of Engineers,” and the contracting parties agreed “ the findings of the contracting officer, approved by the Chief of Engineers, shall be accepted by the parties hereto as final.” The record in this case shows one instance where a request was made for an extension of time by reason of delays caused by the Government, and in this instance the contracting officer admits the delay was caused by the defendant but recommends no extension of time. The Chief of Engineers did not approve or disapprove the recommendations of the contracting officer but relegated all questions of remissions of liquidated damages by reason of delays caused by the Government to the completion of the contract. The record is painfully silent as to any further recommendations of the contracting officer and discloses no action of any bind by the Chief of *185 Engineers. This court must take the record as it finds it with the assumption that both sides have produced and introduced all the available competent and material evidence in their possession. The plaintiff was entitled under this clause (5) to the fair, honest, and impartial recommendation of the contracting officer, and the fair, unbiased judgment of the Chief of Engineers on the recommendations of the contracting officer.
In Lewman, et al. v. United States, 41 C.Cls. 470, 478, the court held:
“ In the ruling of the engineer officer the claimants were entitled to the exercise of an honest judgment, weighed by the rule of reason and law. That is to say, the officer whose power as a subordinate is limited should look to the contract for his authority in directing the work thereunder, and in his interpretation thereof, as well as in any changes authorized to be made by him in the specifications, he should, keeping in view the purpose and intent of the contract, impose upon the contractor the minimum of additional work and expense.”
The record discloses no decisions were made by the Chief of Engineers, and whether these questions of extension of time were ever brought to his attention is clothed in abysmal silence. The assumption is a fair one that they were not, otherwise his decisions could have been readily introduced in evidence. On the contrary the record clearly discloses that the contracting officer was notified by the Comptroller General that all questions of payment for extra work, what was extra work under the contract, assessment of liquidated damages, and the remission of damages by reason of delays caused by the Government were matters beyond the control and judgment of the contracting officer and were to be submitted to him for decision. The record discloses the acquiescence by the contracting officer in the demand of the Comptroller General and notification by the contracting officer to the contractor that that course should be followed in all claims made by it. The terms of the contract were plain and should have been followed by the contracting officer.. The Comptroller General had no authority under the contract to act in any way. The contra,ctinp officer in his testi *186 mony was Comptroller General and assigns tbis fear as an excuse for his failure to pass on these questions and bis subservient assignment of bis plain duty to tbe Comptroller. Penn Bridge Co. v. United States, 59 C.Cls. 892, and Eaton, Brown & Simpson v. United States, 62 C.Cls. 668, 685.
At tbe end of tbe contract the plaintiff was forced to present its claims for what was extra work, what should be paid for tbe extra work, and the question of remission of damages by reason of delays caused by acts of the Government to tbe Comptroller. Each and every one was refused, with one exception, although tbe record discloses the plaintiff was delayed by acts of the Government in furnishing defective machinery, requiring the contractor to perform extra work, delay in arrival of material which the Government had to supply, unforeseeable cause of delay arising through no fault of the contractor, and the requirement that ■extra work be performed after the contract dates fixed for completion had expired and for which liquidated damages were assessed.
The Government undertook to furnish certain equipment and supplies which under the terms of the contract were to be delivered within six months after the date of the approval of the contract. It is admitted the Government failed to carry out the provisions of the contract in this regard and that the equipment and supplies were not delivered within the six months’ period. The record discloses also that after the date of completion of each vessel as called for in the ■contract and during the period for which the contractor was assessed liquidated damages for delay on its part, the Government required the contractor to perform extra work in the installation of radio equipment and other change ■orders. It is true in many cases the plaintiff was required to state, when given the change order or extra work, that the performance of the extra work would not involve extension ■of time for completion, but, as held in Plack et al. v. United States, 66 C.Cls. 641, 651, to give this language any force the contractor would be liable no matter how promptly and ■efficiently he performed the work. To so hold would be an •absurdity.
*187 Tbe record discloses delays caused by the contractor am delays for which the Government is responsible. In almost every instance it is impossible to allocate any definite, certain number of days, due to the l<^>se, vague, and unreliable methods pursued by each party to the contract in keeping account of the time lost by fault of the other. There seems to have been no effort or attempt made by either party to definitely fix the responsibility of the other for delays so that an accurate computation could be made. It was well known by both that each was occasioning delays from time to time. The contractor was claiming extension of time by reason of delays caused by the Government and the contracting officer was complaining the work was behind schedule, but the record fails to disclose any reliable record kept by either party to fix the real number of days by which responsibility could be fixed. The Comptroller General simply added the number of days from the date named in the contract for the completion of the dredges and the dates on which the Government accepted the vessels, and assessed liquidated damages at the amount named in the contract multiplied by the combined number of days on all four vessels and added the costs of inspection and superintendence. No remission of even a single day was granted the contractor for delays caused by the Government, although the record abounds with instances where defective machinery furnished by the Government had to be repaired and placed in good condition, where extra work was required, the very nature of which necessarily required additional time, and where the contracting officer had admitted the Government had delayed the work by supplying faulty material. The contractor was entitled to a decision on these matters of delay and to the impartial, honest, and uninfluenced opinion and decision of the contracting officer and the Chief of Engineers. The record discloses it was forced by the contracting officer to submit its claims to a third party who was not mentioned in the contract and whose decision is ■of no binding effect. See Carroll v. United States, ante, p. 103, where the question is elaborately discussed with a review of the authorities. See also Burton Coal Co., 60 C.Cls. 294. affirmed 273 U.S. 337.
*188 The rule is well settled that where both parties are responsible for the delay in completion of the contract and it is impossible to ascertain the true balance by setting* off one against the other, no liquidated damages can be assessed. See Standard Steel Car Co. v. United States, 67 C.Cls. 445, and cases cited.
The plaintiff is entitled to a judgment in the sum of $127,718.58, including the following items:
Extra work, hopper door operating- gear- $1, 546. 77
Additional manifolds, lubricating oil system- 3, 579. 04
Extra work changing gravity lubricating oil tank to
■ pump system_ 1, 665. 83
Repairing cylinder auxiliary engines- 10, 734.12.
Liquidated damages for delay and cost for additional superintendence and inspection, deducted from the contract _ 110,187. 82:
It is so ordered.
Williams, Judge; Littleton, Judge; Green, Judge; and Booth, Ghief Justice, concur.
ON DEPENDANT’S MOTION FOR NEW TRIAL
Whaley, Judge,
delivered the opinion of the court:
This is a motion to set aside the judgment of the court in the above-entitled case made by the defendant and the granting of a new trial and “ to permit the introduction of new and material evidence bearing upon the judgment, to change, modify, and amend the special findings of fact filed herein, to make new findings of fact and conclusions of law, for the reasons more particularly hereinafter specified.”
Accompanying the motion is an affidavit made by one Horatio G. Gillmor, a rear admiral of the Construction Corps, United States Navy. In this affidavit the affiant alleges he was technical assistant to the late Charles F. Jones,, the attorney for the Government in the trial of the case, and that he procured “ certified copies of public bills, vouchers, canceled checks, and related data from the General Accounting Office ”, and “ That after the testimony of the plaintiff taken in Chester, Pennsylvania, June 17 and 18, 1929, was concluded, and in connection with the preparation of defendant’s rebuttal, the said attorney discussed with the affiant. *189 the use to be made of the certified copies of the public bills, vouchers, and checks above referred to as evidence, and af-fiant understood it to be the intention of the said attorney to introduce the same in evidence in connection with the testimony of Major Robert W. Crawford, whose examination was contemplated; that the said attorney was at that time- and continued, during all of the time that further testimony was taken in the case, to be in very poor and failing health; that the affiant believes that the failure, omission, or oversight of the said attorney to introduce the aforesaid certified copies of public bills, vouchers, checks, etc., in evidence was due to his impaired physical condition at the time and during the period that testimony in the case was being taken.”
It appears from the record in the case that Mr. Jones participated in the active trial of the case when all the evidence was introduced by both sides, and furnished to the commissioner of the court tentative findings of fact setting out his views as to the material facts to be incorporated in the commissioner’s report. Shortly after the commissioner’s report was filed, Mr. Jones departed this life. Mr. Jones had a long and varied experience in the practice before this court and had conducted many important cases for the Government. Shortly after his demise Mr. J. Robert Anderson was assigned by the Department of Justice to prepare the briefs and conduct the further trial of the case. Mr. Anderson has practiced in this court for a very long period and has represented the Government in many important cases. There can be no inference that the Government’s case was neglected at the trial when these two members of the Department of Justice prepared the brief and trial of the case.
Accompanying the motion for a new trial made by the defendant through its attorney, Mr. Anderson, and the affidavit of Rear Admiral Gillmor, are three exhibits, A, B, and C, which it is claimed, should the court grant a new trial, the defendant will introduce in evidence, and that these exhibits contain facts which, if permitted in evidence, would materially change and alter the facts found by the court, and require the application of different legal principles.
*190 There is no allegation that these papers were not in the .possession of the defendant during the trial of the case and that the attorney who tried the case, Mr. Jones, was not fully familiar with their contents. The affiant, Near Admiral Gillmor, in his affidavit, alleges that he discussed the contents with Mr. Jones before the defendant had completed its evidence and before the commissioner had made his report of the facts. If these papers were well known to Mr. Jones, and to Rear Admiral Gillmor, it necessarily would follow, and it is a fair assumption, that they were also well known to Mr. Anderson, who prepared the brief on the report of the Commissioner and the testimony in the case and had the trial of the case before this court. In no sense of the word can these papers be considered as newly discovered evidence. The contents of them were well known to Mr. Jones, to Rear Admiral Gillmor, and to Mr. Anderson before the actual trial of the case, and at no period in its conduct were they ever offered in evidence, or any attempt made to have them considered until after the judgment of this court, and application is now made for the first time to put them in evidence. If they were deliberately kept from the record by Mr. Jones in the conduct of the case, during the taking of the evidence, and Mr. Anderson was familiar with them after the commissioner’s report had been made, and did not move to have the case reopened for the purpose of their introduction, it is a natural assumption that there must have been some good and potent reason for not introducing them.
We have carefully gone through these voluminous papers and we find that there is nothing contained therein, which, if they were admitted in evidence, would alter or change a single fact found by the court, but on the contrary these papers corroborate, fully justify, and amply confirm the facts found by the court. Especially is this true in reference to the delays caused by the Government and the liquidated damages assessed against plaintiff. Among 'hese papers are letters from the Comptroller General requesting reports from the Chief of Engineers in reference to items which are covered by the claims in the case and reports by *191 the contracting officer in which he admits the delays caused by the Government through its failure to furnish important machinery, and other items of material which the Government was called upon to furnish, and recommends that no allowance be made therefor. In each instance, where the Comptroller General has written a letter to the Chief of Engineers, it is specifically stated that the matter is “ respectfully referred for administrative examination, report, and recommendation, together with the return of the papers.” In each instance, the Chief of Engineers has returned the report of Major Crawford with his concurrence, but with the statement that it- was “ an administrative examination and report.”
A careful review of these papers shows that these reports made to the Comptroller General were for the purpose of allowing him to pass on the claims of the contractor, and in no instance, with the one exception mentioned in the opinion, did the Chief of Engineers render an impartial, unbiased judgment on any question. Repeatedly in these reports of the contracting officer which were made for the Comptroller General, he admits the Government delayed the contractor, but not in a single instance does he allow a single day, although articles to be furnished by the Govern-: ment did not arrive until six months after the date fixed for their delivery in the contract. A large item of the claims made by the plaintiff, and allowed by the court, was liquidated damages assessed against the plaintiff for delays in the delivery of the ships. During the construction and while payments were being made to the contractor, there was a retained percentage taken out of each payment, but in addition to this amount the contracting officer undertook to and did deduct certain amounts for liquidated damages for delay from each voucher. At the time these amounts were arbitrarily deducted by the contracting officer, the Government was fully protected in the retained percentage which amounted to almost $100,000, more than the total amount deducted for liquidated damages at the end of the contract. There was nothing in the contract which allowed or permitted this arbitrary deduction from time to time of the *192 on contrary, Chief of Engineers had issued an order early in the contract that all questions of liquidated damages should be remitted to the end of the contract. Nevertheless, the contracting officer arbitrarily assumed to himself the right to make the deduction of these amounts from time to time. There was no justification for it under the contract, and there is no law that we know of which would permit such a course of action.
The course of action thus adopted, deducting liquidated damages without first deciding upon their lawful deducti-bility, was in no way calculated to assist the contracting officer in arriving at the judgment required of him by the contract. Its evident purpose was to compel the contractor to appear before the General Accounting Office, plead his case there, and await its decision, whereas the contracting officer and the Chief of Engineers were the agreed tribunal,, their judgment and approval being exclusive. And it may be emphasized in passing, that the recovery here is of monies that, belonging to the plaintiff, were without lawful warrant diverted into the Treasury of the United States, and, though the property of the plaintiff, there remain.
To exemplify the finding of fact that the Comptroller General made the decision on all claims filed by the contractor, and that the Chief of Engineers did not render decisions, it is only necessary to quote three paragraphs of exhibit C, which accompanies the motion, and on which the defendant relies to change the findings of fact that the plaintiff was never accorded his rights under the contract to the unbiased and unhampered decisions of the contracting officer and of the Chief of Engineers on questions arising under the terms of the contract.
Exhibit C is a copy of a letter from Philip B. Fleming, major, Corps of Engineers, to the General Accounting Office. Paragraph 2 thereof reads:
“Attention is invited to the fact that the accompanying vouchers were presented to the undersigned, a disbursing officer, for payment, and that because of the language used in requesting authorization by the Chief of Engineers, and to avoid suspensions and disallowances, it is the desire of *193 •the undersigned that settlement in accordance with the merits he made hy the General Accounting Office.” (Italics ■ours.)
Paragraph 3 reads:
“ It is not deemed proper to make any specific recommendation that the vouchers be or be not paid. Whether ■or not payment should be made depends on the construction ■of the terms of the contract, and this, it is understood the accounting officers claim full authority a/nd right to determine.” (Italics ours.)
Paragraph 6 reads:
“ In lieu of a specific recommendation that payment be made it may be stated that if, as formerly, there was reasonable certainty that due credence would be accorded to the judgment and determinations of officials with intimate knowledge of the controlling facts and circumstances, the voucher as presented by the contracting officer, duly certified, would be paid by the undersigned, the disbursing ■officer.”
In addition to what has been said as to the contents of these exhibits, so much of them as may by any stretch of the imagination be taken as representing a judgment of the contracting officer are under the rules of evidence inadmissible, for they are no more than interdepartmental reports, made without the knowledge of the plaintiff, and for ^administrative purposes only. ' Brannen v. United States, 20 C.Cls. 219, 225; Block v. United States, 7 C.Cls. 406; Rigsbee v. United States, 58 C.Cls. 93. The only document ■clearly evidencing a judgment on the .part of any Government official communicated to the plaintiff is the certificate of settlement by the Comptroller General, which expresses ■his own judgment in the matter, and we have held that ■the judgment of the contracting officer, when approved by ■the Chief of Engineers, was alone final and binding.
After a careful review and painstaking investigation into these exhibits we can find no error of fact or law or other valid reason upon which to base a motion for a new trial. In addition, the motion totally fails to comply with -.the rule of this court on which motions for a new trial *194 should be based. It is against the practice of this court in form, and violates the uniform procedure which should be followed in making a motion for a new trial. The motion is overruled. It is so ordered.
Williams, Judge; Littleton, Judge; and Geeen, Judge,. concur.
Booth, Chief Justice, took no part in this decision on account of illness.