Jones, Judge,
delivered the opinion of the court:
The plaintiff entered into a contract with the defendant to furnish all labor and materials and perform all work required for the construction of officers’, pharmacists’, and nurses’ quarters, as well as a garage, storehouse, laboratory, and animal house at the Naval Operating Base (Hospital), Pearl Harbor, in accordance with specifications. The contract price was $180,351.88.
The time for completion was 210 calendar days from the date of receipt of notice to proceed. Notice to proceed was received February 29,1928, thus fixing the completion date as *76 September 26,1928. Due to change orders the time for completion was extended to November 17,1928.
Plaintiff sues on four separate causes of action. The proof of the amount of damages sustained in reference to the second, third, and fourth causes of action we regard as insufficient to form the basis of a recovery on the part of the plaintiff.
Consideration will be limited to the first cause of action which seeks to recover liquidated damages for 189 days at $100 per day, withheld by defendant at the time of final settlement. There is also a small unpaid balance of the contract price which is conceded by the defendant.
Almost as soon as the work began controversies arose between Admiral F. T. Chambers, Public Works Officer in charge of the contract work, and Neil H. Evans, plaintiff’s superintendent. These controversies continued throughout the performance of the contract.
The first controversy arose over the, workability of the concrete, the mix of which was supervised by an inspector under the direction of the Public Works Officer, and also over the time demanded by the Public Works Officer for inspection of the placed reinforcing steel before he would permit the concrete to be poured. The Public Works Officer insisted that too much water was being used in the concrete, while plaintiff’s superintendent contended that the Public Works Officer would not permit him to use enough water for the type of materials available in the Hawaiian area. The Public Works Officer determined the amount of water that went into the concrete. ,
The materials available in that area were much more porous than in most continental areas and required a greater amount of water. Even the Government engineers who testified admitted that this was true.
The controversy became so acute that the superintendent on June 3, 1928, wired plaintiff’s president in New York to come to Hawaii to help in straightening out the difficulty. Plaintiff’s president reached Hawaii June 21, 1928, after an 18-day trip. The pouring of concrete, which had been stopped on June 3, was resumed on June 23, 1928, and was completed about September 4, 1928, except for “finishing only”, but during the entire period the controversy over the *77 workability of the concrete continued to rage. . Soon after the work started the Public Works Officer formed a dislike for plaintiff’s superintendent and repeatedly sought his removal.
The testimony is overwhelming that the Public Works Officer repeatedly interfered with the concrete mixing and pouring operations and required plaintiff to use less water than was needed, and this attitude and determination on the part of the Public Works Officer caused many difficulties and interfered materially with the progress of the work.
When the forms were removed some of the concrete had voids known as “honeycombed concrete.” Plaintiff insisted that this was caused by the Public Works Officer’s refusing to permit him to use enough water in the concrete. The Public Works Officer declared that the concrete had not been sufficiently tamped. At any rate, it was necessary that the work be repaired, which plaintiff contended could be done by filling in and smoothing off, but the Public Works Officer insisted that all this concrete be torn out and replaced entirely.
Early in January 1929 plaintiff requested inspection for final acceptance. Two Government inspectors went through the buildings, and in their judgment they were in shape for acceptance. However, when the Public Works Officer thereafter went to make the inspection, he went into the living room of one of the buildings, said it was unfit for human habitation and started to leave. He was urged by the superintendent to point out specifically what was wrong, whereupon he mentioned two or three minor matters and then left without inspecting the remainder of that building or any of the other buildings. A few days later, after repeated requests, he sent some inspectors over who made a considerable list of defects, most of them minor. Plaintiff corrected these. From time to time other minor defects were pointed out, and when corrected still other requirements would be made. There were some small spots on one of the porch floors, the removal of which was demanded. Plaintiff desired to correct this by removing the topping, which it claimed was the usual and only way it knew to remove oil spots. The Public Works Officer refused to permit it to be *78 done in this way, and at the same time refused to suggest any other method which he would approve.
The work was 95 percent complete in November 1928, but was not accepted for many months thereafter. Plaintiff’s superintendent became convinced that because of the feeling towards him by the Public Works Officer the work would not be accepted so long as he remained on the job. On February 26,1929, he therefore withdrew, and Fred Jordan took over as plaintiff’s superintendent, with the approval of the Public Works Officer. At this time the Public Works Officer demanded that the head carpenter be discharged, and Jordan complied.
Jordan testified that at the time he took over the work was 100 percent complete, but that about a week would be required to make the necessary minor corrections that had been suggested. Jordan was kept on the job until May 25, 1929, when the work was finally accepted. Most of this time he put in with a few helpers doing maintenance work, which was not a part of the contract.
The record is replete with evidence of arbitrary action on the part of the Public Works Officer. His lack of cooperation at times amounted almost to deliberate obstruction.
The contract provided that in making partial payments 10 percent of the estimated amount might be withheld until final completion and acceptance of all work covered by the contract. In the payment for June 1928 the defendant withheld $2,196.36 in excess of 10 percent on the estimated amount; in September 1928 the defendant withheld from the plaintiff $3,869.44 in excess of 10 percent of the estimated amount.
When the president of the company was sent for the Admiral stated that he would not listen to them — that they would have to listen to him, and that if they wouldn’t listen to him he “would break them as he broke the contractor at the Boston Navy Yard”. When asked how it would be done he stated that he would save up all the defects until time for acceptance and then he wouldn’t accept the building. This is exactly what he did in this case. Largely in this manner he continued to delay final approval until liquidated damages *79 of $100 per day had practically eaten np the 10 percent which the defendant had withheld, plus the unpaid balance which defendant concedes. The testimony shows that the customary way is to suggest minor defects as they arise and thus give the contractor an opportunity to correct them as the work progresses.'
It is difficult to understand the attitude of the Public Works Officer as it shines through the entire record. It is evident that even his inspectors were afraid to cross him. When plaintiff, not knowing of anything else to be done, so advised the inspectors who had been sent over by the Public Works Officer, and asked for suggestions, the inspector replied that he could not suggest anything, but that he would hate to be in the superintendent’s shoes. Another of the defendant’s inspectors said they did not dare disagree with the Public Works Officer.
In the state of the record it is impossible to apportion the exact portion of the delay for which each of the parties was responsible, but the evidence is overwhelming that the actions of the defendant’s officers and employees were the chief causes of these delays. In these circumstances, it was not proper for liquidated damages to be assessed.[1] In fact, the entire record strongly indicates that if there had been reasonable cooperation on the part of the Public Works Officer and permission for plaintiff to proceed in a normal way with only necessary and proper rulings and requirements on the part of defendant’s officer in charge, the work might well have been completed within the time specified in the contract.[2]
Defendant insists that there was no appeal from the decision of the contracting, officer, and that therefore plaintiff is not entitled to recover the liquidated damages which were withheld from its contract price. This position is not tenable. Not only were considerable sums in excess of the amount provided in the contract withheld as progress payments, and not only was final approval delayed for several months, i. e., until May 25, 1929, but final payment was de *80 layed for a long period thereafter. The Public Works Officer did not make his report to the contracting officer for almost a year, and on July 9, 1930, the contracting officer made his •decision. This was more than a year after the work was completed and accepted. The plaintiff claims that it was never advised of this action by the contracting officer, and therefore had no opportunity for appeal, even if such appeal had been required in the circumstances. The record does not show that the plaintiff was advised of this decision, nor does it show that it was ever furnished with a copy of it. It was in the nature of an interdepartmental communication, and was merely the approval'by the contracting officer of a recommendation by the Public Works Officer.
In this state of the record, we do not think there was any justification for the assessment of liquidated damages. The plaintiff is entitled to recover the sums so withheld from its contract price; also a balance of $519.59 which was a part of the contract price and which defendant concedes has not been paid. Plaintiff undoubtedly sustained other damages in the way of increased costs of operation, but on these items the proof as to the amount is insufficient.
Judgment will be entered in the sum of $19,419.59. It is so ordered.
Madden, Judge; WhitakeR, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.

 Wharton Green & Co., Inc. v. United States, 86 C. Cls. 100, 109; Sun Shipbuilding Co. v. United States, 76 C. Cls. 154, 188.

 Ripley v. United States, 223 U. S. 695, 701; Phoenix Bridge Co. v. United States, 85 C. Cls. 603, 629.