Whitaker, Judge,
delivered the opinion of the court:
The plaintiff sues the defendant for the sum of $259,033.99, setting out 15 causes of action growing out of the execution of a contract between it and the defendant for the erection of 68 buildings, providing 91 officers’ quarters, at Patterson Field, Fairfield, Ohio.

First cause of action

The first cause of action is for an alleged unwarranted deduction of the sum of $6,270.55 on account of a decrease in the amount of excavation which the plaintiff estimated would be necessary.
The plaintiff agreed to erect the buildings for the lump sum of $1,018,300.00, which included the excavation shown. The Government, however, says that it is entitled to deduct the above-mentioned sum from this lump sum price by *35 reason, of tbe provision of item XIII of plaintiff’s bid, which provides in part:
Item XIII. “ Unit Prices.”—
The Contractor shall submit “Unit Prices” in the following schedule for all items listed below.
Those “Unit Prices” will be used in making deductions from or additions to the contract amount, provided any deviation from the drawings and specifications decreases or increases the work indicated or required.
“Unit Prices” shall include the furnishing of all labor and material, complete in place, unless otherwise noted herein.
(a) Earth Excavation, One Dollar ($1.00) per cu. yd.
* if! # «Í Jfc
The plaintiff replied that this provision is inapplicable because there had been no deviation from the work indicated or required by the drawings and specifications.
The plans showed the finished grade, but did not show the natural grade, or the elevation of the buildings above this grade, but paragraph S. C. 6, page 7a of the specifications required the contractor to visit the site to determine “the relation of finished grades of the buildings to existing grades and the natural surface of the ground.” The testimony shows that from a visit to the site and from the plans ■a contractor was able to determine the amount of excavation “indicated” by the drawings and specifications.
This contractor did visit the site and examined the plans preparatory to putting in its bid. From this it estimated that a certain amount of excavation would be necessary. But because it was not known just what the elevation of the buildings would be, and because, therefore, it could not determine exactly the amount of excavation that would be necessary, it made its estimate sufficiently high to cover contingencies. Its estimate was based on the amount of excavation “indicated.” The proof does not show there has been any deviation therefrom. This estimate it included in its figures to arrive at the lump sum for doing all the work.
But the defendant suspected that its estimate for doing this work was more than it had actually cost it, and de *36 manded its work sheets to determine this fact. When it turned out it had not cost as much as had been estimated, the defendant asserted the right to deduct the excess.
There is no justification for this. The plaintiff’s contract was to do the work called for by the contract for a certain sum, irrespective of cost, and it was defendant’s duty to pay the sum stipulated, irrespective of cost. This sum was subject to decrease or increase only in the event there was a “deviation from the drawings and specifications,” decreasing or increasing the work indicated. Here there was no deviation from'the amóúhPof work indicated. Although 'the natural grade was not shown on the plans, the required visit to the site supplied this data and from the two the amount of excavation indicated could be and was determined. The exact amount that would be necessary could not be determined because the elevation of the buildings had not been fixed, but while the plans and specifications did not show exactly the amount to be “required,” they did “indicate” that amount. The proof shows they indicated the amount necessary within a foot or so, and there is no proof there was any deviation therefrom. There is, therefore, no justification for any deduction from the lump sum bid. That it did not cost plaintiff as much as it had estimated certainly offers no justification for such a deduction.
On this cause of action the plaintiff is entitled to recover, unless the defendant is right in its contention that we have no jurisdiction to render judgment by virtue of the provisions of article 15 of the contract quoted in finding 5, which provides that—
* * * all other disputes concerning questions arising under this contract shall be decided by the contracting officer * * *.
If this provision be given the broad scope contended for by the defendant, this court would have no jurisdiction of any controversy between parties arising out of a contract in any event, save only in a case where the contracting officer’s actions had been arbitrary, capricious, or so grossly erroneous as to imply bad faith. It would leave to the decision of the contracting officer the settlement of all rights of the parties. It would allow him to determine whether *37 or not either party had breached the contract in any respect and to determine the amount due the plaintiff thereunder. If the defendant had unreasonably delayed the contractor in the performance of his work and put him to additional expense on account thereof, or had otherwise caused him damage, his right to recover therefor would depend upon the decision of the contracting officer. If this decisison was against him, his only recourse would be an appeal to the head of the department.
We cannot believe that this was the intention of the parties. Especially. can we not believe this when we take into consideration that the person to determine the rights of the parties was the agent of one of the contracting parties. This court in Barlow v. United States, 35 C. Cls. 514, at pages 544-545, said of such a contract:
If the full intent and effect be given to this provision which the defendants now ascribe to it, the contractors might as well have written an agreement on half of a sheet of paper, binding themselves to perform whatever work and furnish whatever material the Chief of the Bureau might require, and accept therefor whatever remuneration _ the Secretary of the Treasury might be pleased to give them.
It is well settled that provisions preventing resort to the courts to settle the rights of the parties are to be strictly construed against excluding this right. This remedy will not be denied unless the language of the contract makes such a conclusion inescapable. Mercantile Trust Co. v. Hensey, 205 U. S. 298; Central Trust Co. v. Louisville, St. Louis & T. R. Co. 70 Fed. 282; Zimmerman v. Marymor, et al. 290 Pa. 299; and other cases cited in 54 A. L. R. 1255. This rule should be applied especially in this case because the contract was drawn by the defendant and it provided that its officer should be the final arbiter, and because the contractor had no option but to take the contract as written, or lose the work. Callahan Construction Co. v. United States, 91 C. Cls. 538, 611. We think that disputes, as to which the contracting officer’s decision is final and conclusive, should be narrowly limited.
The purpose of article 15 was to prevent interruption in the work on account of disputes between the parties as to *38 the requirements of the contract. This is plainly indicated by the concluding sentence of the article, which reads: “In the meantime the contractor shall diligently proceed with the work as directed.” We think the article means that if the parties disagree as to what work is required of the contractor, the final decision thereon shall -be left to the contracting officer, subject to appeal to the head of the department, and that the contractor is required to do whatever work the contracting officer decides the contract requires, and that it shall not suspend work because it thinks more is being required of it than should be. The contracting officer’s interpretation of the contract requirements of the work to be done is binding on the contractor, but beyond this he has no right to go.
Again we quote from Barlow v. United States, supra, at page 546:
* * * In the cases of all building contracts there are matters to be determined as the work progresses. Some one must pass upon the fitness of the material, the sufficiency of the workmanship, the amount of work performed, etc. These are matters which can not be left until a building is completed; it is for the interest of both parties that they be settled as the work proceeds. The architect or engineer in charge being the person most familiar with the work, and professionally fitted to pass upon such questions, is ordinarily designated as the referee or arbitrator to determine them. Such agreements for such arbitraments must be upheld. But the agreement now under consideration is a very different thing. It goes far beyond anything that has come before the court since the case of Douglas, for it sets up the Secretary of the Navy, having no personal knowledge of the matter in dispute, as being in effect an appellate court of justice — the court of last resort. It in effect binds one party to abide as to every matter of fact, and as to every question of legal right, by the decision of the other party. Lord Coke said centuries ago that it becomes no man to be both judge and party in the same case.
We are of the opinion that the contract in this case did not give to the contracting officer the right to decide the amount due the contractor, except insofar as his decision of the amount of work required by the contract determines *39 this question. The instant decision was not an interpretation of what the contract required of this contractor in the way of excavation. By his decision he has said that because the contractor did not have to do as much excavation as it had estimated, it is not entitled to collect the amount included therefor in its bid. This is beyond the authority conferred upon him. The contract gave him the right to make deductions only in case there was a deviation from the amount of work indicated or required by the plans and specifications. Here there was no such deviation. The plans and specifications were changed in no detail and, therefore, in making the deduction he has exceeded the power conferred on him.
We do not think this is in any way contrary to our decision in Silas Mason v. United States, 90 C. Cls. 266. Our holding there went no further than to say that the contracting officer’s decision as to what work was required by the contract was final and conclusive. To that position we adhere. But here the question is not what work was required by the contract, but whether the contractor is entitled to collect the amount stipulated in the contract because it did not have to do as much work as it had estimated.
It results that the plaintiff is entitled to recover on its first cause of action.
However, it appears the contracting officer allowed the plaintiff the sum of $2,641.05 because it had to extend the concrete footings to a depth beyond that it had estimated. The plaintiff was not entitled to this extra compensation. Since it was paid to it because the elevation of the buildings above the natural grade was not definitely shown, and since we have held that this fact did not relieve the defendant from paying the full price bid, although the amount of excavation necessary was less than that estimated, we hold that the extra amount paid for concrete footings must be deducted from the amount the contracting officer deducted from the lump sum bid on account of the decrease in the amount of excavation estimated.
It results that the plaintiff is entitled to recover the sum of $3,629.50 on its first cause of action.

*40
Second cause of action

The contract provided that the concrete footings under the foundation walls should be of varying widths for the ■several types of quarters. Later, plaintiff was notified that all footings should be of the uniform width of 4 inches on each side of the foundation wall, and it was advised that the price to be paid under the contract would be adjusted ■accordingly. Later, there was deducted $20.00 a cubic yard for the reduction of 94.19 cubic yards. The plaintiff agrees ■on the amount of cubic yards reduced, but says that the unit price to be deducted was not $20.00 per cubic yard, but $6.30 per cubic yard.
The change was made under article 3 of the contract and under item XIII of the invitation for bids, quoted supra, which provides'for the. deduction of “unit ■ prices” where there is a deviation in the work required by the drawings and specifications. This item provides for a deduction of “type A concrete * * * including forms * * * at $20.00 per cubic yard.”
The plaintiff in support of its position says that the $20.00 per cubic yard applies only when concrete and forms are increased or decreased, and does not apply where only the ■concrete and not the forms are reduced or increased, and it says that the change ordered resulted only in a reduction ■of the amount of concrete, and did not result in any reduction-in the amount of forms necessary.
The evidence amply supports plaintiff’s contention. The ■changes ordered did not result in reduction in the forms necessary, but did result in reduction in the amount of ■concrete poured in these forms. This being true, paragraph (c) of item XIII is not applicable because it provides for a reduction . in concrete incbuling forms. The reduction to be made, therefore, is the reduction provided for in article 3, which provides for “an equitable adjustment.” Plaintiff’s proof that this equitable adjustment is $6.30 per cubic yard is not controverted. The reduction to be made, therefore, is $593.40, instead of $1,883.80, which was the amount deducted by the contracting officer. Plain *41 tiff is, therefore, entitled to recover the difference of $1,290.40.
We think it is entitled to this deduction, notwithstanding the action of the contracting officer holding that the deduction of $1,883.80 should be made, since the contracting officer’s action in making this deduction was not authorized by the contract. The contract confers certain authority on the contracting officer, and when he acts within the scope of that authority his decisions are binding; but when it appears that he has exceeded that authority, or has acted in a way contrary to the mandate of the contract, it is the duty of this court to set aside his decision and render that decision required by the contract. The contracting officer’s deduction of $20.00 per cubic yard for reduction in concrete only was hot authorized by the contract and, therefore, must be set aside.
Plaintiff is entitled to recover on this item the sum of $1,290.40.

Third cause of action

The specifications required the contractor to use a mix of one part cement, two and one-half parts of fine aggregate, and five parts of coarse aggregate for type “A” concrete. Before mixing the concrete the plaintiff obtained from the Constructing Quartermaster approval of the sand and gravel and its method of proportioning cement, sand and gravel, and water; but after some thirty or more cubic yards had been poured and the forms had been removed, it was discovered that a large part of it was honeycombed. Because of this defect, the Constructing Quartermaster ordered about 80 percent of it, or 25.1 cubic yards, removed and replaced. The plaintiff sues for the cost thereof on the theory that it was impossible to .prevent - honeycombing with the mix specified. The testimony is in conflict over this question. Two concrete experts introduced by the plaintiff testified that it was not possible to prevent honeycombing with the mix specified, but an expert from the Bureau of Standards testified that it was possible. It is also true that the Constructing Quartermaster, at plaintiff’s request, permitted a change in the mix from that specified to one *42 part of cement, 3.1 parts of fine aggregate, and 4.4 parts of coarse aggregate, and that after this change had been made no further trouble was experienced with the concrete poured. But, on the other hand, it is also true that while the first concrete was being poured the plaintiff was advised that the pour was not satisfactory, but, nevertheless, it continued to pour it.
The Assistant Secretary of War, on appeal from the decision of the contracting officer, decided that the honeycombing—
* * * was caused by the method employed by you in handling the concrete, and your failure to take proper precautions in pouring and mixing the same, and not due to an incorrect ratio of the mix which you allege would inherently cause a segregation of the coarsest aggregate.
We think the contract conferred authority on the contracting officer to make final and conclusive decisions on whether or not plaintiff’s work was up to the standard required by the specifications, subject to appeal to the head of the department. Plainly, the parties intended to confer on the contracting officer the authority to determine such questions as the work progressed, and they did not intend that the further prosecution of the work should await a trial of such an issue before a court. Such questions had to be determined on the ground, immediately, as the work progressed, in order to prevent a stoppage of the work. On such questions the contracting officer was the final arbiter, subject to the right of appeal.
However, plaintiff asserts vigorously that the right of appeal was denied it, that the appeal granted to the head of the department was pro forma only; that no genuine consideration was given to it by the contracting officer’s superiors and, therefore, that the decision of the contracting officer is not final and conclusive, but may be reviewed by this court. If no genuine consideration of the appeal was given to it by the contracting officer’s superiors, as designated by the head of the department, it is plain that we have the right to review the contracting officer’s action. Failure to give it such consideration would be a plain breach of the contract. Plaintiff did not agree to submit its rights *43 to the uncontrolled action of the contracting officer. From a careful review of the evidence, both for the plaintiff and the defendant, we conclude that adequate consideration was not given to it by the contracting officer’s superiors.
It had been agreed between the plaintiff and the defendant that the prosecution of appeals from the decisions of the contracting officer might be deferred until conclusion of the work or thereabouts. About the time the work was finished the plaintiff and its representatives came to the War Department for the purpose of presenting its position on the disputes appealed. They first went to see Brigadier General Guiney, an assistant to the Quartermaster General, who was the contracting officer. He referred them to Captain Bazire, a subordinate, with whom they had a number of extended discussions.
In the course of these discussions plaintiff requested Captain Bazire to let them see the report of the constructing quartermaster on the disputes. He refused to do so, since, he said, the information contained therein might be useful to plaintiff in making out a claim against the defendant. They were also informed that the decisions of the constructing quartermaster on questions of fact were taken as final and conclusive by the War Department and that no investigation of the facts would be made by the Department, although the contractor might dispute the statement of facts of the constructing quartermaster. Finally, they were advised that in cases of doubt as to the correctness of the constructing quartermaster’s interpretation of the plans and specifications, this doubt was resolved in favor of the Government. All this convinced plaintiff it could make no progress with Captain Bazire and it inquired if the matter might be presented to the Secretary of War. Upon being told they might do so, they arranged through one of the Senators from Ohio for a conference with The Assistant Secretary of War, Mr. Woodring. Mr. Woodring told them (to quote the testimony of Mr. Goldman, which is amply corroborated) that—
* * * he didn’t have time to hear appeals, that he couldn’t take the time to consider these matters or pass judgment on them because he had too many other weighty things to do—
*44 and be referred them to a Colonel Dunn. Colonel Dunn told them that he did not have time to pass on the questions, and referred them to Major Pearson. Major Pearson said he did not have time, and referred them to some captain in his office. This captain told them that questions of this sort were left to the Quartermaster General’s office'for determination. They then went to see the Quartermaster General. He was out and they were referred to one of his assistants, who was Brigadier General Guiney, the contracting officer. General Guiney informed them that he did not have sufficient information to talk to them and referred them to Captain Bazire, his subordinate. Mr. Goldman said:
I explained to General Guiney that’s where I started, that I was going back to the very place from which the appeal was really coming, because Captain Bazire had told me that he followed the field.
They, were, nevertheless, required to interview Captain Bazire. •
. Only to Captain Bazire did they have any opportunity to present their case, and this was without having the benefit of the position of the constructing quartermaster. See Morgan v. United States, 304 U. S. 1, 16-21. They had no opportunity to present it to a superior of the contracting officer. Only his superior, of course, could pass on an appeal from his decisions.
Finally Captain Bazire, in conjunction with one of his assistants, Mr. Gray, wrote out a recommendation to The Secretary of War setting out the action to be taken on plaintiff’s various appeals. This was written for the signature of Brigadier General'Guiney, who was the contracting officer. General Guiney signed it “For the Quartermaster General” and forwarded it to The Secretary of War. The only documents inclosed with the report were the recommendations of the constructing quartermaster, two letters from the Public Works Administration, and a letter to be sent to the plaintiff which had been drafted for the signature of The Assistant Secretary of War. The letter as drafted was signed by Harry H. Woodring, The Assistant *45 Secretary of War. This letter, omitting the first paragraph, reads as follows:
In this connection the Head of the Department or his duly authorized representative only acts in an administrative capacity, and relies solely, upon the. evidence and data presented to it through the Office of The Quartermaster General. The Office of The Quartermaster General has been delegated by The Secretary of War to assemble all necessary data in connection-with appeals to the Head of the Department and in so-doing it also acts in an administrative capacity and whatever its findings or recommendations might be they are not open to argument or review by the contractor concerned.
Accordingly, while I would be pleased to arrange a-personal hearing for you at your convenience with the-head of the Department or his duly authorized representative, nevertheless, such facts as bear upon the case in question, which you evidently desire to present in person,, should haye been submitted previously to the Qúdrterniaster General'-in writing.-
The proof does not show to what extent The Assistant. Secretary of War considered the recommendations drafted' by Captain Bazire and his assistant and signed by Generali Guiney, or to what extent, he considered the matter otherwise. However, we think it can be safely assumed that he-gave it but scant consideration, if any, in view of his statement to Mr. Goldman, quoted above, that “he couldn’t take the time to consider these matters or pass judgment on them because he had too many other weighty things to do.”
The plaintiff by a number of witnesses undertook to-prove that the only consideration that was, ever given to its-appeals was by Captain Baziire. The defendant introduced no one who disputed this fact. The inference from the-entire testimony is inescapable that no superior of General Guiney, the contracting officer, ever gave this matter more-than cursory consideration, if any.
The defendant contends in this case that the contractor agreed to forego its right to resort to the courts for protection of its rights, and agreed to leave to the officers of the-other contracting party the sole right to decide what its; *46 rights were, subject to review by no one. If this be true as to any dispute, then it must follow that the consideration given the dispute in the first instance, and the consideration given it on appeal, must be a genuine consideration, something approaching the consideration that would be given it were it tried in a court of justice. The proof shows that the consideration given the disputes by the superiors of the contracting officer did not even approach that to which the plaintiff was entitled. Cf. Morgan v. United States, 304 U. S. 1, 16-21.
The plain truth is that the appeal was in reality denied, and it was denied, forsooth, because, said The Assistant Secretary of War, “he couldn’t take the time to consider these matters because he had too many other weighty things to do.” Yet it was The Assistant Secretary of War who had required the plaintiff to surrender its right to appeal to the courts and who had insisted that he should be the final arbiter of plaintiff’s rights. The procedure was a travesty of justice. It cannot be countenanced in an enlightened civilization. In such a case the courts must step in and protect plaintiff’s rights. See Sun Shipbuilding & Dry Dock Co. v. United States, 76 C. Cls. 154, 185; Lawman v. United States, 41 C. Cls. 470; Carroll et al. v. United States, 76 C. Cls. 103.
We conclude that the appeal provided for by the contract having been denied the plaintiff, this court may review the decision of the contracting officer.
Two experts introduced by plaintiff testify that it was not possible to prevent honeycombing in the concrete with the mix specified; an expert from the Bureau of Standards testified that it was possible; but, at any rate, the constructing quartermaster, at plaintiff’s request, permitted a change in the mix, and thereafter no further trouble was encountered. It seems to us that the evidence preponderates in favor of plaintiff’s position, that the cause of the honeycombing was the mix specified.
Plaintiff, therefore, is entitled to recover the cost of removing and replacing the concrete condemned in the amount of $881.18.

*47
Fourth cause of action

In its fourth cause of action the plaintiff sues for $288.84 for furnishing and installing 2,500 special half-timber anchors to secure the half-timber work in place, which it says was not required by the contract.
Paragraph 158 of the specifications reads in part:
158. '* * * Half timber work brackets and Barge boards shall have adzed finish. Half timbers shall be fitted together by halving or with mortise and tennon construction where shown, and pinned with hardwood pins.
All half timber work shall be put together with white leaded joints and secured in place with lug screws or bolts as noted on drawings or nailed where and as necessary.
Construct wood brackets to detail shown.
Paragraph 72 provided:
72. Mason!s and carpenters building iron. — Furnish all anchors, joist hangers, straps, hangers, plates, bolts, and all other iron or steel work of whatever description required to properly construct the building.
Windows shall be set so that same with their respective hinges, catches, etc., will work freely, all to the satisfaction of the C. Q. M.
The Contractor shall do all field drilling, tapping, or other miscellaneous work necessary to properly prepare and install the various items.
Anchors for wood wall plates shall be rods, of length shown or required, with anchor plate, nut and washer.
Tie straps for joists where shown on drawings shall be of size and spacing indicated.
Paragraph G. C. 20 provided :
G. C. 20. Complete Work Required. — It is intended that the drawings and specifications include everything requisite and necessary to properly finish the entire work, notwithstanding every item necessarily involved is not particularly mentioned; all work when finished shall be delivered in a complete and undamaged state.
The contracting officer ruled' that these anchors were required by the plans and specifications. The letter signed by The Assistant Secretary of War read;
Item YI. Buck anchors, timber anchors, etc. — This Department considers that you were required to furnish *48 all the anchors included in this item of your claim under the specific and general terms of the contract. Your request for additional compensation arising out of this item is disallowed.
The question as to whether or not these anchors were required called for an interpretation of the provisions of the contract. We are not satisfied that the contracting officer’s decision thereon was erroneous. The plaintiff, therefore, is not entitled to recover on this item.

Fifth cause of action

The defendant concedes that the plaintiff is entitled to recover the sum of $164.00 for the installation of special anchors to anchor the exterior masonry walls to the attic floor construction and from the attic floor construction to the roof construction on 17 of the buildings of types “E” and “F,” since these items were not called for by the plans and specifications. We agree that this is so. The plaintiff is entitled to recover $164.00 on this cause of action.

.Sixth came of action

In this cause of action the plaintiff sues for alleged cost of connecting the gas and water pipes in the buildings to the outside gas and water pipes, and also for the cost of making a sewer connection. The defendant admits that this work was not required by the contract, and acknowledges liability for the reasonable value of the work done. The Acting Secretary of War has allowed plaintiff the sum of $202.24. but this sum has not been paid. Plaintiff made claim for $521.99, claiming it had been necessary to use additional material in running the pipes from the place where it was supposed to run them under the contract to the outside pipes. But upon investigation it was discovered that the pipes had not been run for the length claimed by the plaintiff, and the plaintiff admitted— '
* * * it is quite possible that we are in error regarding the exact quantity of extra pipe furnished and installed by us, and furnished by the government in making these service connections, as this information was taken from rough sketches made by the workmen of our subcontractor for plumbing, heating, and gas fittings, who installed the service connections.
*49 But the plaintiff insisted that its claim for labor costs in making these connections was correct because they were obtained from actual records made at the time. The bill submitted by plaintiff, which is filed as exhibit N-5-E, shows total material of $123.57, and total labor costs of $238.50. We think the plaintiff has carried the burden of proof as to the labor cost, but that it has not done so as to the cost of the material furnished.
Plaintiff’s bill, therefore, should be reduced by the amount of material claimed, plus the 10 percent overhead, 10 percent profit, and 1 y2 percent bond incident to this material cost. This would reduce plaintiff’s claim from $527.99 to-$376.22, which amount it is entitled to recover on this cause of action.
Plaintiff’s testimony further shows that after some of the connections had been made it informed the Assistant Constructing Quartermaster that the cost of making the connections was between $2.00 and $2.25. There were 182 connections. At $2.00 a connection the total cost would have been $364.00, which is approximately the amount above figured, excluding the material.
We do not think that the plaintiff is bound by the action of the Secretary of War on this item aside from his failure to grant plaintiff the appeal to which it was entitled. There-is nothing in the contract which gives to the contracting-officer or the Secretary of War the right to determine the amount due plaintiff for this character of extra work.. Plaintiff’s claim does not arise under the contract, but outside of it. This was not an extra ordered in the manner set forth in the contract. Plaintiff’s right to recover is grounded, not on the contract, but upon the fact that the work was done with the defendant’s knowledge and consent and that it accepted and retains the benefit thereof.

Seventh cause of action

Plaintiff waives its claim set out in this cause of action..

Eighth cause of action

In this cause of action the plaintiff sues for the sum of $1,774.63 for the cost of installing concealed radiation ins *50 the buildings of types “G” and “H”. The plaintiff contends the plans did not call for concealed radiation.
It is true the architectural plans of the buildings did not show concealed radiation, but the heating plans did, although not very definitely. Under the heading of “Radiator Schedule” it was provided that the symbol “A” would denote concealed radiation of 29 square feet, and that symbol “B” would denote concealed radiation of 40 square feet. Instead of using the symbol “A” on the basement plan, the draftsman showed at certain places what would appear to be recesses and marked them C.R. 29 cp. In other words, • the draftsman put “C.R. 29 cD” instead of using the symbol -“A.” This clearly indicates,.it seems to us, that concealed radiation was to be installed at these places, but if there was • any doubt in the contractor’s mind about whether or not • this was so, it was its duty to take the matter up with the contracting officer and obtain from him a decision as to what . was intended. This it did not do, but instead proceeded with the work in the face of article 2 of the contract, which reads as follows:
In any case of discrepancy in the figures or drawings, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense.
Moreover, the contracting officer has decided this dispute adversely to the plaintiff and, being a dispute over the proper interpretation of the drawings and specifications, we do not think it should be disturbed unless we are convinced it was erroneous. We are not so convinced. The plaintiff is not entitled to Recover on this cause of action.

Ninth cause of action

The specifications required all conduits to be concealed. Whether or not they were sufficiently concealed without the use of grooves was a matter committed to the discretion of the contracting officer. That decision was against the plaintiff, it was within the scope of the contracting officer’s authority, and we are not convinced it was erroneous.

*51
Tenth cause of action

Plaintiff sues for an extra of $225.00 for the installation of milled door frames not called for by the plans and specifications. Plaintiff is correct in saying that they were not. called for by the plans and specifications. It would appear, however, that plaintiff is responsible for their having been used. The defendant did not require them of the plaintiff. At the beginning the plaintiff furnished shop drawings showing these doors. They were approved by the Constructing Quartermaster, with the addition of a moulding which apparently cost 67 cents an opening for 54 openings. When the plaintiff discovered its mistake it asked for an extra, but the Assistant Constructing' Quartermaster replied that the moulding which he had added to the plaintiff’s drawings had not increased the expense, and plaintiff’s request was refused.
Later plaintiff submitted a formal proposal to furnish these frames for the cost of $225.00. About a month later the Quartermaster General instructed the parties to follow the plans and specifications and not to incur extra expense. But plaintiff, without waiting for this decision, had gone ahead, and installed the frames. Under this statement of facts it seems plain tó us that plaintiff is not entitled to recover.

Eleventh cause of action

Plaintiff seeks the sum of $2,103.73 for the alleged cost of furnishing certain structural - steel which it claims was not-called for by the plans and specifications.
The contracting officer has ruled adversely to the plaintiff, and apparently this ruling is correct, since Jones & Laughlin Steel Corporation, which furnished plaintiff with the steel, has withdrawn any claim for having been required to furnish more steel than that called for by the plans and specifications. It would appear that plaintiff has been put to no extra expense in this matter unless the labor cost for in-' stalling the steel was greater than it should have anticipated. But the proof shows that the heavier steel installed was permitted in order to save plaintiff from loss from the fabri *52 cation of the steel by a subcontractor prior to the time its ■shop drawings had been approved.
It seems clear to us that plaintiff is not entitled to recover >on this claim.

Twelfth came of action

The plaintiff seeks to recover the sum of $869.78, the cost of applying a coat of paint to the structural steel which it ■.alleges was not called for by the plans and specifications.
The contracting officer has ruled against plaintiff. The contracting officer was made the interpreter of the plans and ■specifications and we are not convinced his ruling was erroneous.

Thirteenth cause of action

In this cause of action the plaintiff sues for damages for delay occasioned its subcontractor on account of the failure to furnish electrical fixtures on time. The defendant admits the plaintiff’s subcontractor was damaged.
After reviewing the testimony, we are convinced this is ■so. The amount of the delay, however, is difficult to ascertain. The proof of plaintiff’s subcontractor is the only proof in the record. This shows additional labor cost of $724.69, and additional truck expense of $85.00, and, in addition, plaintiff claims $1,640.59 on account of additional stockkeeper’s time, additional superintendent’s time, additional overhead bosses’ time, and additional insurance costs.
Inasmuch as the fixtures were furnished before the buildings were completed, we are satisfied it was necessary for the plaintiff’s subcontractor to keep the stockkeeper and the superintendent and the overhead bosses on the job, irrespective of the failure to deliver the fixtures on time. At any rate, it would have been necessary, no doubt, for them to have been kept on hand a portion of this time. Accordingly, we allow plaintiff its full claim for additional labor costs and for its truck expense, but we allow only one-half of its claim for stockkeeper’s time, superintendent’s time, overhead bosses’ time, and additional insurance costs.
Plaintiff is ehtitled to judgment for the sum of $1,629.99 on this cause of action.

*53
Fourteenth cause of action

In this cause of action plaintiff sues the defendant for the difference between the amount paid its brickmasons at $1.20 an hour and the amount which it was ordered to pay of $1.30 an hour. It is clear that plaintiff is not entitled to recover. The contract provided for a minimum wage of $1.20, with the proviso that a larger amount should be paid if a larger amount had been agreed upon by organized labor and its employers.
When it was found by the Commissioner of Conciliation of the Department of Labor of the State of Ohio that $1.30 an hour was the prevailing wage, the Constructing Quartermaster ordered the plaintiff to pay this wage. This the plaintiff did without making any protest against this ruling. In the absence of such a protest and since the plaintiff did not appeal to the Board of Labor Beview, it is clear it is not entitled to recover on this cause of action.

Fifteenth came of action

In its fifteenth cause of action plaintiff sues for the sum of $235,562.56 for extra costs incurred on account of an alleged erroneous labor ruling.
Article 19 (a) of the contract provided in part as follows:
Art. 19. (a) Labor preferences. — •Preference shall he given, where they are qualified, * * * in the following order: (1) To citizens of the United States and aliens who have declared their intention of becoming citizens, who are bona fide residents of the political subdivisions and/or county in which the work is to be performed and (2) to citizens of the United States and aliens who have declared their intention of becoming citizens, who are bona fide residents of the State, Territory, or district in which the work is to be performed: Provided, That these preferences shall apply only where such labor is available and qualified to perform the work to which the employment relates.
(b) Employment services. — To the fullest extent possible, labor required for the project and appropriate to be secured through employment services, shall be chosen from the lists of qualified workers submitted by local *54 employment agencies designated by the United States Employment Service: Provided, however, That organized labor, skilled and unskilled, shall not be required to register at such local employment agencies but shall be secured in the customary ways through recognized union locals.
Plaintiff was a union contractor, employing exclusively union men. The place where the work was to be performed was in Greene County, some ten or fifteen miles from Xenia,. Greene County, and approximately the same distance from Dayton, Ohio, and Springfield, Ohio, both of which latter places were in counties other than Greene; Dayton in Montgomery County, and Springfield in Clarke County. The defendant ruled that the above-quoted provisions of the contract required plaintiff to give preference not only to-labor in Greene County, but also to labor in the contiguous-counties of which Dayton and Springfield were the principal cities. The plaintiff contends that the contract required it to give preference to labor from Greene County only, and when this labor supply was exhausted that it had the right to secure its labor from any place in the State of Ohio.
There can be no question about the correctness of plaintiff’s position. The defendant’s ruling requiring plaintiff' to give preference to labor fiom Dayton and Springfield was manifestly erroneous. As a result of it plaintiff was largely restricted to Dayton and Springfield in securing its labor. There were but few union laborers in Greene County,, but there were available in Dayton and Springfield sufficient union labor to do the work and, hence, plaintiff was prohibited from going to other places within the State to-secure its labor. Plaintiff says that as a result of this ruling labor from Dayton and Springfield and Greene County believed that they had a monopoly on the job, and that, however poor their work might be, the contractor was required to employ them and was prevented from securing labor elsewhere. Accordingly, it alleges that the labor it secured loafed on the job, was inefficient and indifferent, and that this resulted in excess labor costs in the amount sued for.
There is no doubt that many of the laborers on the job were indifferent and that much time was wasted. The- *55 proof is abundant that this was so; indeed, the Constructing Quartermaster stated, “There was more loafing done on this job than I have noticed on any other job in my experience.” In addition, there is considerable proof in the record that a good deal of the labor was inefficient, but that plaintiff was nevertheless required to use it because it was the best that could be obtained from the restricted field.
We cannot, however, agree with plaintiff that the indifference of the labor and their trifling were due only to the fact that they thought they had a monopoly on the job and, therefore, were not required to put forth their best effort. Plaintiff’s own proof shows that their attitude was induced, in part at least, by their belief that the project was initiated for the benefit of labor, that it was a relief project, something in the nature of a dole, and that, being of this nature, it was not expected of them that they hold their jobs only at the price of honest endeavor, but that their wages would be paid to them whether or not they gave an honest day’s work.
In addition, defendant’s proof tends to show that the excess cost was due in part to unwise planning of the work and to inefficient supervision. It was also due in part to the inefficiency of the subcontractor doing the plumbing, gas fitting, and heating work, necessitating his dismissal and the taking over of his contract by the prime contractor. There was also a strike of some of the workmen, which, of -course, increased the labor cost.
In our opinion there was more than one factor which contributed toward the increased labor cost. A reading of the proof, however, leaves no- doubt in the mind that the defendant’s erroneous labor ruling was a large contributing factor.
The real problem encountered is to determine to what extent plaintiff was damaged by this erroneous ruling. The plaintiff’s proof of the amount of this damage is unsatisfactory. It introduces a good deal of proof as to what the labor cost should have been. This sum it deducts from what it actually did cost, and the balance, it says, is the damage suffered on account of the erroneous ruling. From *56 wbat we have said above, it is manifest that this is not adequate proof of its damage, since, for one thing, we are convinced that factors contributed to the increased cost other than defendant’s erroneous ruling.
This being the situation, the defendant says its damage is too speculative, too conjectural, for any judgment to be rendered in plaintiff’s favor.
It is well settled that where it is speculative or conjectural as to whether or not the damage caused was the result of the wrongful act on the part of the other contracting party, the party alleged to have been injured cannot recover; but, on the other hand, where it is established with sufficient definiteness that the wrongful act has caused or has contributed toward the damage, the party injured will not be deprived of recovery because the amount of the damage cannot be definitely ascertained. The F. Mansfield & Sons Co. v. United States, 94 C. Cls. pp. 397, 420-421, and cases there cited; Palmer v. Connecticut Railway Co., 311 U. S. 544, 560. In Story Parchment Co. v. Paterson Co., 282 U. S. 555, 562, 563, the court said:
* * * It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.
# * * ❖ *
Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot *57 be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. * * *
It is extremely difficult to say just what part of plaintiff’s damage was caused by the erroneous ruling, what part by the prevalent belief that this was a relief job and that labor was not expected to do an honest day’s work, what part was due to bad planning, if any, and what part to lack of alleged proper supervision, etc. We can but arrive at such conclusion as we think the proof and the reasonable inferences to be drawn therefrom reasonably justify.
In arriving at a conclusion certain additional facts must be taken into consideration. The plaintiff started work on April 13, 1934. The defendant first issued the ruling in question three months later, on July 14, 1934. Plaintiff protested the ruling, and continued to do so, but the ruling was reaffirmed on August 22, 1934, against which plaintiff continued to protest, hoping that it would be able to get the defendant to revoke it. However, on November 15, 1934, defendant required one of plaintiff’s subcontractors to discharge some of its plasterers who had been brought in from places other than the restricted district. Whereupon, plaintiff, convinced of the hopelessness of persuading the contracting officer that the ruling was erroneous, requested that the matter be referred to the Board of Labor Review. It appears that from July 14, 1934, when the ruling was first made, to November 21, 1934, when the request for reference to the Board of Labor Review was made, the contracting officer’s ruling had not become so greatly burdensome on plaintiff as to induce it to exhaust its remedies to have it set aside. Plaintiff’s superintendent testified that the effect of the ruling on the morale of the men began to appear sometime in August 1934, which was some four months after the work had commenced, but apparently the situation had not become intolerable until sometime in November. The work was completed on June 1, 1935, except for some minor details, and was fully completed on July 1, 1935.
Plaintiff’s total pay roll to the first of July, 1935, was $540,964.36. Of this amount there had been expended up to August 3, 1934, a total of $62,370.58; up to September 6, *58 1934, there had been expended a total of $120,478.61; up to October 5, 1934, a total of $196,058.61; and up to November :2, 1934, a total of $277,652.79. If we assume the effect on ¡the morale of the men of the labor ruling reached its full extent about midway between the first of August 1934, about when its effect first began to be felt, and November 21, 1934, when plaintiff took its appeal to the Board of Labor Review — say, about October 5, 1934 — we find that plaintiff had already spent $195,058.61 for labor, and that thereafter, and prior to July 1, 1935, it expended a total of $345,905.75.
The proof further shows that a considerable majority ■of the men employed gave an honest day’s work and did good work. The indifferent, trifling attitude of the labor ■on the job was confined to a comparatively small number.
' When we take into consideration that at the time the ruling of the contracting officer had reached its maximum effect about 40 percent of the work had been done; and when we •consider that there were a number of factors which affected •or probably did affect the increased labor cost other than defendant’s erroneous ruling; when we consider that many ■of the workmen on the job were faithful and efficient and were in no way affected by the fact that this was a relief job or that labor from the communities in question had a monopoly on the job, and that only a relatively small percentage loafed on the job and were inefficient; and when we consider, too, the indefiniteness of plaintiff’s proof as to its damage from all causes, to wit, by subtracting the amount which it computes the job should have cost it from what it actually did cost it — when we take all of these things into consideration, it is evident that plaintiff’s claim of $235,562.56 as the damage incident to this erroneous labor ruling is quite excessive. After the time the labor ruling-reached its maximum effect, plaintiff spent but $345,905.75 for its labor, yet it claims an excess labor cost of $235,562.56
Just what was the amount of plaintiff’s damage on account of this ruling it is impossible to say, but taking into consideration all the facts and circumstances it seems to us to be a fair and equitable conclusion to reach that this ruling *59 did not increase its labor costs more than $45,000. We are of the opinion that this sum would fairly compensate plaintiff for the damage suffered on account of this ruling.-
Defendant says plaintiff is not entitled to recover anything' because it misconceived its remedy and took an appeal to the; Board of Labor Beview instead of to the head of the department. The plaintiff was amply justified in taking the appeal to the Board of Labor Beview, although it may have been mistaken in so doing, and it should not be denied recovery because the defendant drew the contract so as to leave in doubt whether the appeal lay to the Board or to the head of the department. Besides, when the Board refused jurisdiction, the plaintiff did undertake to get the head of the department to rule on the dispute and allow it additional compensation. He affirmed the contracting officer’s ruling.. This was grossly erroneous. Judgment will be rendered for the sum of $45,000 on plaintiff’s fifteenth cause of action.
On the whole case the plaintiff is entitled to recover of the defendant the sum of $52,971.29, for which judgment will be rendered. It is so ordered.
Jones, Judge; Littleton, Judge; and Whaley, Ghief Justice, concur.