Whitakek, Judge,
delivered the opinion of the court:
The plaintiff had a contract with defendant for the paving of runways, taxiways and apron strips at the Municipal Air* port at Atlantic City, New Jersey. It claims that it was required to use more concrete than that called for by the specifications ; it sues for the cost of the excess.
The contract was not well drawn, but we think that the contracting officer’s interpretation of it, affirmed on appeal by the head of the department, was correct. It certainly was not arbitrary, capricious, or so grossly erroneous as to imply bad faith. If not, it is final and conclusive under the provisions of article A9 of exhibit B to the proposal, which was embodied in the contract. This article reads:
On all questions relating to the acceptability of material, classification of material, proper execution of the work, and the interpretation of the specifications, the decision of the Contracting Officer shall be filial, subject to appeal as provided for in Article 15 of the contract.
Under such a provision and under the decisions of the Supreme Court and of this court it is final and conclusive. Plumley v. United States, 226 U. S. 545; McShain v. United States, 308 U. S. 512, 520-521; McCloskey & Co. v. United States, 103 C. Cls. 254.
The contract provided for the construction of the runways, etc., “in accordance with Schedule III of Proposal No. 1-43-261.” This schedule read in pertinent part:
Concrete pavement, plain — cement content per cubic yard of concrete to be 6.0 bags (approximate), 6" section with thickened edges, to be constructed one or two lanes at a time in accordance with Specification P-501 and drawing l-E-803, including necessary fine grading, preparation of subgrade in accordance with Specification P-103 and the furnishing of High Early strength Portland cement{ aggregates, and all materials complete in place for finished pavement.
*418 The contracting officer required the use of 6.0 bags of cement. The contractor says that it was required to use only 5 bags of cement, because this is the amount of cement specified in Specification P-501 for use in a mild climate, and it says that Atlantic City has a mild climate.
In order to determine what the contract means it will be helpful to review the preliminaries to its execution.
On October 13,1942 the Civil Aeronautics Administration-invited bids “for the paving of runways, taxiways and apron for the Atlantic City, New Jersey, Municipal Airport.” The invitation recited:
This proposal is No. 1-43-261 and requests for complete proposal should mention that number. The proposal with drawings, specifications, etc., can be obtained from the Regional Manager, First Region, Department of Commerce, Civil Aeronautics Administration, C. A. A, Building, LaGuardia Field, New York, N. Y.
The proposal secured from the designated official contained the following under ' the heading “Specifications and Drawings”:
The work is to be in accordance with applicable specifications and drawings attached hereto, the special provisions of this proposal, and in accordance with the following specifications and drawings:
Specification — See Exhibit “C” attached.
Deawings — See Exhibit “C” attached.
Exhibit “C” referred to above reads as follows:
(DRAWINGS LARGER THAN 8% X 11 — BOUND SEPARATELY)

*419 Specification No. P-102 related to “Airport Grading”; P-103 related to “Preparation of Subgrade or Airport Runways, Taxiways and Aprons”; 1-226 related to “Sand, Gravel, Sub-Base for Airport Paving”; and P-501 related to “Portland Cement Concrete Pavement (Plain and Reinforced) for Airport Runways, Taxiways and Aprons.”
All these specifications were general specifications in use by the Civil Aeronautics Administration. They were not drawn for any particular job. It is not shown when P-102 was adopted, but P-103 appears to have been adopted on August 1,1941,1-226, on June 16,1942, and P-501, on July 1, 1942. There is nothing to indicate that at the time they were adopted the present project was in the mind of the Administration. Proposals for this work were requested more than a year after the adoption of P-103, and some months after the adoption of 1-226 and P-501. The specifications were evidently adopted for the guidance of contracting officers in preparing specifications applicable to a particular job.
For instance, in the second paragraph of the “introduction” to P-501 it is stated:
The pavement as set forth in the specification is either plain or reinforced Portland Cement Concrete pavement, based on a specified cement content. The reinforced type should be considered where severe climatic conditions produce temperature stresses and where the mat reinforcement will aid in crack control. [Italics ours.]
This evidently was addressed to the contracting officer preparing specifications for a particular job. He was told he could use either plain or reinforced concrete and that he should “consider” the use of reinforced concrete where severe climatic conditions produced temperature stresses.
In the third paragraph of the introduction the contracting officer is directed to “supplement” the specifications in a certain way. This paragraph reads:
In order to provide a completed description this specification should be supplemented by standard construction drawings showing details of design as to location and construction of expansion and contraction joints; the size, spacing, etc., of dowel bars or dowel bar assemblies, tie bars and reinforcement. The details of construction *420 should conform to standards as set forth in drawings No. 434 and 435.
But in the fourth paragraph he is told he should not use this type of pavement “to compensate for unstable subgrade conditions.”
A reading of certain provisions of the specification itself shows that it is general in nature and that it was intended that its provisions should be selected by the contracting officer with reference to the requirements for the particular job, although certain provisions did, of course, relate to all projects. No better illustration can be given of this than section 3/5, upon which the plaintiff relies. This sets out three classes of paving concrete and gives the specifications for each. These specifications vary widely both in the character of aggregate to be used and in the amount of cement. It says that Class A is to be used “Where Severe Climatic Conditions Prevail”; Class B “Where Moderate Climatic Conditions Prevail”; and Class C “Where Mild Climatic Conditions Prevail.”
It is inconceivable that it was intended thereby to let the contractor decide which type of concrete was to be used. We have no doubt that it was intended that the contracting officer in preparing the specifications for any particular job should decide between Class A, Class B or Class C concrete, and use the specifications for the class he deemed appropriate.
This is what the contracting officer undertook to do in this case, although he was not very definite about it. He called for the use of “6.0 bags of cement (approximate).” The only class of concrete calling for this much cement is Class A, and we are sure this is what he meant to specify.
By the use of the word “approximate” he certainly did not intend to leave it indefinite whether 5 bags of cement (Class C), or 51/2 bags (Class B), or 6 bags (Class A), should be used, or whether the weight of the aggregate should vary from 537 pounds for Class A to 663 pounds for Class C. This word was used because, as the proof shows, it is not always possible to get in every mix of concrete just exactly the amount of cement specified.
Nor do we think that the contracting officer was permitted to use Class A concrete only “Where Severe Climatic Con *421 ditions Prevail.” He might use this concrete whenever he thought the use to which it was to be put demanded it. *
We do not believe that the plaintiff in this case was misled by this specification. After calling for a concrete pavement using 6 bags of cement per cubic yard, the proposal went on to say: “to be constructed one or two lanes at a time in accordance with Specification P-501 and Drawing l-E-803.” There was no reason for plaintiff to think that when reference was made to Specification P-501 that they were referring only to that part thereof incorporated in section 3/5. That specification related to a number of other things. It related to aggregates in general, and to coarse aggregates, to requirements for grading of coarse aggregates, and to requirements for grading of fine aggregates, to the kind of cement, to pre-molded joint material, to the sort of water used, to materials to be added for workability, to calcium chloride, etc., etc. The proposal called for the work to be done in accordance with all the applicable provisions of this specification.
The contractor could not reasonably conclude that it was entitled to select Class A, Class B, or Class C concrete in accordance with its own idea as to whether or not the class selected was suitable for the location in which the work was to be done, and the use to which the concrete was to be put. It was up to the contracting officer of the Government to determine the character of paving he wanted, and we think he did so when he specified 6 bags of cement per cubic yard. Certainly he did not intend to leave to the contractor’s discretion the character of pavement to be constructed, and we are quite sure the contractor knew that he did not. If the contractor had had any such thought in mind, it should have made inquiry before it put in its bid. Penker Construction Co. v. United States, 96 C. Cls. 1, 50.
After it had put in its bid, and after the contract had been signed, calling for construction “in accordance with Schedule III of proposal No. 1-43-261,” the plaintiff for the first time informed the defendant that it considered Atlantic City to have a mild climate and, therefore, it expected to lay Class C concrete. Plaintiff was informed that the defendant intended to call for Class A concrete and thought it had done so. The matter was taken up with the contracting officer and *422 that officer wrote plaintiff that Class A concrete was required. The plaintiff took exception to this ruling of the contracting officer, but it did not at this time appeal to the head of the department, but went ahead and laid the Class A concrete as directed. It was not until after all the work had been done that it appealed to the head of the department from the contracting officer’s denial of its claim for the difference in cost. The time for it to have appealed from the contracting officer’s ruling requiring Class A concrete was when that ruling was made, and not after the work had been done.
So far as the amount of cement to be used is concerned, we think the contract was definite enough. It called for 6.0 bags (approximate) and this is the amount the contractor was required to use. It was not so definite as to the amount of the aggregates, but of this plaintiff does not complain.
We think, in the first place, that the contracting officer’s requirement of Class A concrete was justified by the contract and specifications, but, in any event, we are satisfied that his ruling was neither arbitrary nor capricious nor so grossly erroneous as to imply bad faith.
Plaintiff is not entitled to recover, and its petition will be dismissed. It is so ordered.
MaddeN, Judge; JoNES, Judge; and LittletoN, Judge; concur.
Whalex, Chief Justice, took no part in the decision of this case.